# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| V. | : | CRIMINAL NUMBER 25-435 |
| | : | |
| | : | |
| ANDREW LOVEJOY | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

Andrew Lovejoy, through counsel, submits this memorandum in aid of sentencing. He pled guilty pursuant to an open plea, accepts full responsibility for his actions, and respectfully requests that this Court consider all the mitigating factors explained in this memorandum and impose a non-custodial sentence. His guidelines are 0-6 months. Locking him up at this juncture is not necessary to achieve the sentencing goals of 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005). He has lost his standing in the community. He has lost his job. The strictures of probation are a limitation on his freedom and a form of punishment. A probation sentence would be sufficient but not greater than necessary to achieve the sentencing goals of 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005).

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts are not in dispute. Between September 2018 and June 2023, Mr. Lovejoy stored undelivered pieces of mail in the basement of his former girlfriend. Following a rift in their relationship, his former girlfriend called the Philadelphia Police Department ("PPD") to report the missing mail. Soon after, postal investigators contacted Mr. Lovejoy, and he immediately admitted to his conduct, waived his *Miranda* rights, and wrote a sworn statement accepting full responsibility. In his letter—and in every subsequent interview he gave—Mr. Lovejoy explained that this offense was the result of feeling wholly overwhelmed by number of packages he had to deliver. Even after

working approximately 60 hours every week, Mr. Lovejoy felt that if he kept the packages in a secure location, he would eventually be able to "catch up" and deliver the mail to its intended destination. Upon making his confession, he apologized, explained that his former partner had no involvement, and resigned from his post at the USPS.

On September 26, 2025, a federal grand jury sitting in the Eastern District of Pennsylvania returned a single-count Indictment charging Mr. Lovejoy with theft of mail matter by a postal service employee, in violation of 18 U.S.C. § 1709. Mr. Lovejoy appeared before this Court on December 16, 2025, and pled guilty to Count One of the Indictment, pursuant to an open plea.

## II.     MR. LOVEJOY'S PERSONAL HISTORY

Mr. Lovejoy was born on March 22, 1983, to John Michael Lovejoy (deceased) and Michelle Lovejoy (72) and into a loving household. He lived comfortably and enjoyed a positive relationship with his parents; his father was a veteran from the Vietnam War, and a retired PPD sergeant and homicide detective. His mother was a high school teacher. Although his needs were otherwise met, Mr. Lovejoy suffered from severe attention deficit hyperactivity disorder ("ADHD"), which significantly impacted his childhood. His ADHD would continue to impact his life into adulthood; indeed, it played a substantial role in the events that led to the underlying the offense.

Mr. Lovejoy was only six years old when he received the ADHD diagnosis that would shape the rest of his childhood. This diagnosis came in 1989, at a time when the condition had only recently been formally defined and standardized within the psychiatric community. *See* Kimberly Holland & Tiffany Taft, *The History of ADHD: A Timeline*, HEALTHLINE https://www.healthline.com/health/adhd/history (last accessed March 25, 2026). Indeed, ADHD was not recognized under its current name until 1987, and the diagnostic criteria and treatment approaches were still rapidly evolving. *Id.* During this period, children like Mr. Lovejoy were often subjected to intensive and sometimes intrusive forms of evaluation and treatment, including neurological

monitoring and experimental approaches aimed at understanding a disorder that clinicians themselves were only beginning to define. *See* Jess Romeo, *ADHD: The History of a Diagnosis*, JSTOR https://daily.jstor.org/adhd-the-history-of-a-diagnosis/ (describing how medication use in children with ADHD increased *fourfold* between 1987 and 1996) (last accessed March 25, 2026). Mr. Lovejoy was among the children tested.

As the use of stimulant medications expanded dramatically in the years immediately following his diagnosis, Mr. Lovejoy's childhood was shaped not only by the disorder itself, but by the instability and uncertainty of the medical response to it. These procedures disrupted any sense of normalcy, forcing him to navigate a constant cycle between clinical testing and attempts to maintain an ordinary childhood. The resulting instability was particularly difficult for a child in need of consistency and structure. In addition, Mr. Lovejoy frequently changed schools in an effort to secure sufficient educational support, which made it difficult to form and sustain friendships. For doctors to record his brain and heart activity, Mr. Lovejoy was forced to shave his head so they could place suction cups on his head and all over his body. Ridicule at school ensued. There were nights where he had to stay at a facility to monitor his sleep patterns. He often felt "othered" as a result of both his condition and these ongoing medical interventions.

The treatment also took a physical toll: Mr. Lovejoy slept only a few hours each night and described feeling like a "zombie" during the day. Between the ages of six and eighteen, he at times suffered from malnutrition due to medication side effects, including persistent nausea. As a result of these debilitating side effects, Mr. Lovejoy elected to stop taking the medication when he was 18 years old.

Mr. Lovejoy completed high school successfully, then attempted to get his bachelor's degree at Temple University, but his ADHD made classroom settings incredibly difficult to succeed in. He was only able to complete one semester before opting to pursue other opportunities. He would later

try once more to get a college education at the Community College of Philadelphia but found that schooling simply did not "click" for him. He was able, however, to find his niche in property management, construction, and work as a mechanic.

Although there were internal and external factors driving him to feel like he was not accomplishing enough, Mr. Lovejoy excelled in this work. He thoroughly enjoyed any project that involved building or creating, even as a hobby. As a result of this passion and knack for working with his hands, Mr. Lovejoy later started his own business: Lovejoy Property Management and Construction. As the owner, he would purchase, remodel, and resell houses. While he operated this business, he also worked as an independent contractor for Rich Cole Construction. In 2018, Mr. Lovejoy joined the USPS. It was active, outside, and social. Eventually, as the Court well knows, his duties overwhelmed him.

Mr. Lovejoy's parents both struggled with significant health complications. In 2017, Mr. Lovejoy's father passed away from liver failure. Meanwhile, his mother has struggled with a myriad of health issues that have rendered her essentially immobile and fully dependent on her son to care for her. Ms. Lovejoy suffers from aortic stenosis—a heart valve disorder that restricts blood flow between her heart and her body—as well as rheumatoid arthritis, and severely limited mobility in part due to a bilateral knee replacement. As Mr. Lovejoy understands it, his mother has a "ten step maximum" before she is at risk of falling, and even those ten steps require the assistance of a walker. Indeed, as a retiree, Ms. Lovejoy is completely reliant on her son financially and physically. Mr. Lovejoy has risen to the task, as he has spent much of his adult life living with his mother to ensure the bills are paid and she has everything she needs.

Mr. Lovejoy is deeply remorseful and profoundly ashamed of his conduct. He fully recognizes the harm his actions have caused, particularly to his mother, and the extent to which his behavior has jeopardized his ability to continue caring for her. As her sole caretaker, the prospect of

incarceration raises serious and uncertain consequences for her well-being—consequences that neither Mr. Lovejoy nor his mother fully know how to address. This reality weighs heavily on him and has reinforced his commitment to change. In no uncertain terms, Mr. Lovejoy has learned from this tremendous error in his judgment. He is determined never to reengage in criminal conduct, not only for his own sake, but to ensure that he can continue to support and care for his mother. He is committed to accepting responsibility, paying his debt to society, and returning to work as a law-abiding and productive member of the community.

## III.  APPLICATION OF THE SENTENCING GUIDELINES

Prior to imposing its sentence, the Sentencing Courts must: (1) properly calculate the guidelines range, and (2) exercise discretion by choosing a sentence in full consideration of all relevant 18 U.S.C. § 3553(a) sentencing factors, "regardless [of] whether [the chosen sentence] varies from the sentence calculated under the guidelines." *United States v. Gunter*, 462 F. 3d 237, 247 (3d Cir. 2006). The Sentencing Guidelines are no more than "a starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586 (2007).

The PSR prepared by United States Probation Officer Jerronaka Washington sets Mr. Lovejoy's advisory guidelines range for imprisonment at zero to six months. The defense agrees with Officer Washington's calculation, based on a total offense level of 4 and a criminal history category of I. Mr. Lovejoy is eligible for a sentence of probation under the guidelines. His extraordinary family circumstances (formerly classified as a departure under U.S.S.G. § 5H1.6), and the 3553(a) factors more generally, and support a noncustodial sentence.

### A. Mr. Lovejoy's Extraordinary Family Circumstances Provide a Basis for a Guideline Noncustodial Sentence under U.S.S.G. § 5H1.6.

Until 2025, U.S.S.G. § 5H1.6 provided a basis for a downward departure; now also be considered as a basis for a downward variance. Indeed, upon finding that district courts rarely applied departures—more often opting for variances—the Sentencing Commission decided to exclude all

departures from the 2025 Guidelines Manual. Notably, however, in the Sentencing Commission's introductory commentary, it states that it is "intending that judges who would have relied on facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range *as a variance* under 18 U.S.C. § 3553(a)." U.S.S.G. Ch. 1 Pt. A (emphasis added). Here, Mr. Lovejoy is not asking for a variance, since a term of probation or any alternative noncustodial sentence would still be within the applicable guideline range. As such, the defense submits the following to support a noncustodial, guideline sentence.

Formerly, in order for a sentencing court to find a departure applicable, the application note for USSG § 5HG1.6 stated that it must consider two circumstances: first, it must consider, in general, the following non-exhaustive list of circumstances: (i) the seriousness of the offense; (ii) the involvement in the offense, if any, of members of the defendant's family; and (iii) the danger, if any, to members of the defendant's family as a result of the offense. Second, the Court must find the presence of the following circumstances:

> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

> (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

> (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

> (iv) The departure effectively will address the loss of caretaking or financial support.

> U.S.S.G. § 5H1.6.

In regard to the first prong, all three circumstances are in favor of Mr. Lovejoy receiving a noncustodial sentence. Although any case before this Court is serious, including the underlying offense, this was not a violent crime. Additionally, as noted by Probation Officer Washington, there were no discernable victims apart from those who did not receive their mail. *See* PSR ¶ 11. Though mail disruption can cause meaningful harm in some instances, it is likely more common that the victims' injury was limited in scope and time. Next, Mr. Lovejoy acted alone—his mother was completely unaware of the offense and would not have witnessed it; he stored the packages with his former partner. Finally, Mr. Lovejoy's mother has not been placed in any physical danger as a result of the offense given the aforementioned nature of the offense.

Analysis of the second prong also supports Mr. Lovejoy receiving a non-custodial sentence. First, the service of a sentence of even six months would doubtlessly cause a substantial, direct, and specific loss of essential caretaking *and* essential financial support to Ms. Lovejoy. Mr. Lovejoy buys groceries for his mother, cooks for her, brings her the medication she needs, tends to the residence, takes her to her health appointments, and pays the bills. As someone who cannot walk more than ten steps on her own, incarceration would present incredibly unsustainable circumstances physically, financially, and emotionally for both parties.

Second, the loss of caretaking and financial support would substantially exceed the harm ordinarily incident to incarceration. Many individuals facing incarceration have aging parents who benefit from their child's presence and occasional care. The ordinary loss of caretaking would normally result in a transfer of responsibility to the other parent, a home health aide, or an adult relative. Here, however, there is no such caretaker to take Mr. Lovejoy's place. His siblings do not live nearby. There are no other family members able and willing to move in with Ms. Lovejoy to provide the level of support—financial and otherwise—that she needs.

Third, the loss of caretaking or financial support is one for which no effective remedial or ameliorative programs are reasonably available. While some government and community-based resources exist to assist elderly individuals in need of care, they are neither automatic nor comprehensive. Programs such as Medicaid-funded home and community-based services can provide limited in-home assistance, referrals, and supplemental support. However, these services are typically contingent on strict financial eligibility requirements, may involve significant delays, and often provide only partial coverage of an individual's needs. *See* Alice Burns et al., *A Look at Waiting Lists for Medicaid Home- and Community-Based Services from 2016 to 2025*, KFF https://www.kff.org/medicaid/a-look-at-waiting-lists-for-medicaid-home-and-community-based-services-from-2016-to-2025/ (last accessed March 25, 2026). They are not designed to replace a full-time, dedicated caregiver. As a result, the prospect of Mr. Lovejoy's incarceration raises serious and unresolved concerns regarding who, if anyone, would be able to provide consistent and adequate care for his mother. Mr. Lovejoy's care and financial support in this case cannot be replaced.

Finally, the requested sentence would absolutely and effectively address the loss of caretaking or financial support because Mr. Lovejoy would not be serving a custodial sentence. As further consideration for a non-custodial sentence, it is worth noting that Mr. Lovejoy has been successful in complying with his pretrial release conditions. Although there were two instances of positive drug tests, these were not the results of casual or recreational use: they were taken to address real health concerns. Mr. Lovejoy's medical needs were, with the assistance of Pretrial Services, subsequently addressed by licensed doctors. Based on these reasons, the defense prays that the Court will impose a noncustodial sentence.

IV. **APPLICATION OF THE STATUTORY FACTORS TO THIS CASE**

In the present case, the Court must consider all of the factors identified in 18 U.S.C. §3553(a) to craft a sentence that is "sufficient, but not greater than necessary" to satisfy the

purposes of sentencing. 18 U.S.C. § 3553(a)(1). Counsel submits that these factors uniformly support a noncustodial sentence.

**A.      The Nature and Circumstances of the Offense and Mr. Lovejoy's History and Characteristics**

Although the conduct of the offense is serious, it is non-violent in nature. Further, it bears noting that while interference with mail can, in certain circumstances, carry meaningful consequences, the resulting harm is more often limited in scope than the vast majority of federal crimes.

Mr. Lovejoy accepts full responsibility for his actions and offers no excuse. Even so, the surrounding circumstances provide important context that support the conclusion that this was the act of someone who was overwhelmed, not someone acting maliciously or seeking financial benefit. Mr. Lovejoy sought a job at the USPS in an effort to feel "normal," a feeling that had long since escaped him since childhood, and to please his romantic partner at the time. Soon after he began his job, he began to feel, in Mr. Lovejoy's words, "underwater." Stubbornly, despite recognizing his complete loss of control over his workload, he did not want to "give up" by quitting, so he ultimately made the ill-advised decision to store the undelivered mail in his partner's residence.

There is no question that Mr. Lovejoy made poor decisions that led him to the underlying offense, however, he did not begin storing mail parcels with any intent to commit a crime. Mr. Lovejoy did not steal the contents of the packages, nor did he obtain any financial gain from keeping them. Though he did not begin with intent to break the law, he recognized that this was still the ultimate result of his actions. Notably, Mr. Lovejoy intended to deliver the mail eventually, and he held on to the admittedly naïve hope that he would be able to "catch up" and find a way to maintain his employment. Sadly, as the mail accumulated in mass, and his feeling of being overwhelmed increased in turn, he shut down completely. What began as an overwhelming task snowballed into an insurmountable one. However, upon confrontation, Mr. Lovejoy immediately confessed and

admitted his guilt. He wrote a statement fully confessing to his actions and expressing immense embarrassment, shame, and loss of standing in his community.

**B.      The Need for the Sentence Imposed to Promote Certain Statutory Objectives**

*1.      To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.*

Mr. Lovejoy is now looking at federal prison time or federal probation. Even the mere prospect of these consequences has exacted a toll on Mr. Lovejoy.  He recognizes that the loss of his liberty and jeopardizing his ability to care for his mother are what follows from his actions. He will now carry a federal criminal conviction for theft of mail for the rest of his life. This will greatly impact his future employment prospects, and it is a great source of shame.

While this federal conviction spells a major setback for Mr. Lovejoy, it will also be an opportunity for self-reflection and growth. He knows it. Mr. Lovejoy does not seek to justify or minimize his actions. He made a poor decision to commit a serious crime and one that he will pay for dearly.

*2.      To afford adequate deterrence to criminal conduct.*

Similarly, Mr. Lovejoy's prosecution and conviction for this case in federal court, along with the risk of serving a prison term that could be imposed, provides a more-than-adequate general deterrent to other, similarly situated individuals. Even if he were to receive a non-custodial sentence, Mr. Lovejoy would not be escaping punishment. It is well-established that the *certainty* of punishment, not the *severity* of it, has the most significant general deterrent effect.  *See*, *e.g.*, CESARE BECCARIA, ON CRIMES AND PUNISHMENTS AND OTHER WRITINGS 63 (Richard Bellamy, ed.; Richard Davis, trans., Cambridge University Press 1995); Frank H. Easterbrook, *Criminal Procedure as a Market System*, 12 LEGAL STUD. 289, 295 & n.7 (1983); Alfred Blumstein, *Prison*, *in* CRIME 387, 408-9 (Wilson & Petersilia, eds., 1995); Daniel S. Nagin & Greg Pogarsky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and*

*Evidence*, 39 CRIMINOLOGY 865 (2001); Josiah Tonry, *The Functions of Sentencing and Sentencing Reform*, 58 STAN. L. REV. 37, 52-54 (2005); Raymond Paternoster, *How Much do we Really Know about Criminal Deterrence*, 100 J. CRIM. L. & CRIMINOLOGY 765, 818 (2010) ("The safest conclusion from the literature thus far would be that the perception of certain legal and extralegal sanctions does seem to act as a modest deterrence factor, but that the perceived severity and celerity of punishment do not appear to be effective deterrents to crime, and we know virtually nothing about celerity."). Consistent with this scholarship, even a noncustodial sentence within the guidelines range would send an appropriate message to others and deter people from committing similar crimes.

>    3.    *To protect the public from further crimes of the defendant.*

Mr. Lovejoy's lack of any criminal history and his compliance with the conditions of his pretrial supervision demonstrates that he is not a danger to the community. Furthermore, he would not risk his mother's health or potentially losing his house by committing another offense. Mr. Lovejoy is fully aware that he could receive much more time than his current exposure were he to recidivate; the risk of losing everything and the genuine change he has felt in himself are more than enough to protect the public from further crimes.

>    4.    *To provide the defendant with needed educational or vocational training,*
>          *medical care, or other correctional treatment in the most effective manner.*

In addition to building on his automotive and construction projects, Mr. Lovejoy plans on continuing to work to provide for himself and his mother. He is considering earning his commercial driver's license ("CDL") if his mother's health permits. This career path—and any other educational or vocational training—would best be supported by a noncustodial sentence.

### C.    Kinds of Sentences Available

The range of sentences statutorily available to the Court are listed in Part D of the PSR. As previously stated, Mr. Lovejoy is eligible for probation. The statutory maximum term for probation is three years, and the minimum term is one year. If probation is granted, one of the following must

be imposed by a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service. By contrast, the maximum term of imprisonment is five years. Supervised release is not mandated in this case, though the Court may impose a term of not more than three years. Further, the maximum fine for this offense is $250,000, with a mandatory special assessment of $100.00.

**D.      The Need to Provide Restitution to Any Victims of the Offense**

Restitution is not applicable in this case.

**V.      CONCLUSION**

**WHEREFORE**, for the above reasons and any other reasons deemed just, the defense prays that the Court will grant the defendant's request for a guideline, noncustodial sentence.

Respectfully submitted,

*/s/ Jeremy Isard*
JEREMY ISARD
Assistant Federal Defender

# CERTIFICATE OF SERVICE

I, Jeremy Isard, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have electronically filed and served a copy of the Defendant's Sentencing Memorandum upon Eric Gill, Assistant United States Attorney, to his office located at 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106.

*/s/ Jeremy Isard*
JEREMY ISARD
Assistant Federal Defender

DATE:        March 25, 2026